## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

S.R.J.,

        **Plaintiff,**

        **v.**

MARRIOTT INTERNATIONAL, INC.,
VISTANA SIGNATURE EXPERIENCES,
INC., and ABC, CORPORATIONS NOS. 1-
5,

        **Defendants.**

**Civil Action No:** __2:21-cv-1863____

## COMPLAINT

AND NOW, comes Plaintiff, S.R.J., ("Plaintiff" or "S.R.J."), by its undersigned counsel, Frank C. Botta, Esq., and The Lynch Law Group, LLC, and hereby files the within Complaint and in support thereof aver as follows:

## PARTIES

1.    Plaintiff, S.R.J. is an adult woman and citizen of the United States of America, who is domiciled in Pennsylvania, with an address in Sewickley, Pennsylvania 15143.

2.    Defendant Marriott International, Inc. is Maryland corporation with an address of 10400 Fernwood Rd., Bethesda, Maryland 20817.

3.    Defendant Vistana Signature Experiences, Inc. is a Florida corporation with an address of 9002 San Marco Ct., Orlando, Florida 32819.

4.    Defendants ABC, Corporations Nos. 1-5 represent the entity or entities that possess power, control, and oversight over the spa located at the Westin Los Cabos Resort Villas and Spa. Their address or addresses remain unknown at this time.

## VENUE AND JURISDICTION

5.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) as the parties are citizens of different states and the amount in controversy exceeds $75,000.

6.     Venue is proper in the Western District of Pennsylvania pursuant to 28 U.S. Code § 1391.

## FACTUAL BACKGROUND

### I.     Plaintiff's Background

7.     Prior to pursing her professional endeavors, Plaintiff S.R.J. graduated from college with honors.

8.     During her time in college, S.R.J. was a decorated varsity swimmer with many friends and an unwavering drive to succeed.

9.     At this time, S.R.J. is a young, professional woman who has been promoted four (4) times over roughly the last six (6) years at her previous employer where she continued to excel in her chosen profession.

10.     Prior to the incident described herein, S.R.J. was thriving in her career, with a positive outlook on life and the future.

11.     As a direct result of the incident described herein, and based upon her ongoing mental health struggles, S.R.J. was left with no other choice but to change jobs and leave a lucrative position in management with her prior employer.

### II.     The Relationship between the Defendants

12.     The Westin Los Cabos Resort Villas and Spa (hereinafter "The Westin" or the "Hotel"), located in Los Cabos, Mexico, officially reopened to the public following extensive renovations in June 2017.

2

13.     Advertisements for the new and improved Hotel boasted the features of Spa Otomi (the "Hotel Spa"), with its array of services intended to provide guests with the opportunity to soothe, revitalize and reclaim their well-being while visiting the Hotel.

14.     Through marketing, publications, and other solicitous means, the Hotel has tied itself inextricably to the Hotel Spa.

15.     Indeed, even the name of the Hotel demonstrates the relationship between the Hotel and the Spa.

16.     Upon information and belief, there exists a contractual relationship setting forth the duties and obligations for the Hotel and all of its business partners, vendors and associates to provide safe and secure amenities to Hotel guests.

17.     Upon information and belief, the Hotel Spa would be subject to the duties and obligations of any business partner, vendor and/or associate of the Hotel.

18.     Upon information and belief, the Hotel is a Westin Vacation Club Resort, which is owned and operated by Defendant Vistana$^{TM}$ Signature Experiences, Inc. (hereinafter Defendant Vistana).

19.     Upon information and belief, the Westin is also part of the premium hotel chain owned, operated, and controlled by Defendant Marriott International, Inc.

20.     Upon further information and belief, the Hotel Spa is owned and operated by one or all of the above-named Defendants, or another entity that remains unknown to Plaintiff at this time.

21.     S.J.R., and her parents, selected The Westin as their vacation destination based upon, among other things, the reputation of Westin resorts and hotels, and the Hotel's features, including the Hotel Spa.

### III.   __The Assault__

22.    On or about January 19, 2020, S.R.J. and her significant other arrived at The Westin to meet her parents for a week's long vacation in Mexico.

23.    The next day, while S.R.J. and her mother were relaxing at the Hotel pool, they were approached by two Hotel spa massage therapists, Fernando Chagoyan ("Mr. Chagoyan") and another therapist by the name of Emelia.

24.    The two massage therapists provided S.R.J. and her mother each with a complimentary five (5) minute massage.

25.    Upon information and belief, massage therapists from the Hotel spa regularly sought out to provide complimentary massages to Hotel guests in an effort to entice them into purchasing a longer spa service offered by the Hotel spa.

26.    Mr. Chagoyan, who had provided the complimentary massage to S.R.J., insisted that an indoor spa treatment would be quieter, offer less distractions, and would be overall more preferable for S.R.J. and her mother.

27.    At approximately six feet tall and nearly 200 pounds, Mr. Chagoyan was much larger than S.R.J.

28.    In reliance upon Mr. Chagoyan's insistence and representations relative to the indoor spa treatments offered by the Hotel spa, both S.R.J. and her mother scheduled an appointment for 8:00 a.m. the next day on January 21, 2020.

29.    Mr. Chagoyan was scheduled to provide S.R.J.'s spa treatment scheduled for January 21, 2020.

30.     Initially, S.R.J.'s massage appointment began as expected, and in the normal course as she had experienced during prior spa treatments, which included having a towel draped over her breasts and her lower extremities.

31.     At one point during her massage, S.R.J. was requested to turn over onto her back.

32.     At this time, Mr. Chagoyan placed a cloth towel over S.R.J.'s eyes.

33.     Mr. Chagoyan proceed to perform the massage on S.R.J., however, the spa treatment provided by Mr. Chagoyan quickly went from normal, to highly offensive and inappropriate.

34.     First, Mr. Chagoyan removed the towel covering S.R.J.'s genitals.

35.     Then, Mr. Chagoyan removed the sheet to expose S.R.J.'s entirely naked body.

36.     In addition, Mr. Chagoyan proceeded to engage in repeated, improper and nonconsensual sexual contact with S.R.J., including, among other things, groping S.R.J.'s vagina, thrusting his fingers into her vagina and grabbing and fondling her breasts.

37.     Mr. Chagoyan engaged in this unwanted, nonconsensual, and improper sexual conduct while S.R.J. was in a vulnerable position, laying on her back, and completely undressed.

38.     When S.R.J. attempted to move her leges to the left in an effort to stop any further sexual assault from taking place, Mr. Chagoyan continued the unwanted, nonconsensual, and improper sexual contact by deepening his invasive and harmful penetration with his fingers.

39.     Only after started to rise from the massage table and forcibly pushed Mr. Chagoyan's hand away was S.R.J. finally successful in stopping the sexual assault.

40.     S.R.J. was traumatized, in complete shock, and in fear of imminent physical harm.

41.     Mr. Chagoyan proceeded to place his hands on her arms and neck.

42.     S.R.J. was frozen with fear and convinced that Mr. Chagoyan was going to harm her as he continued to massage S.R.J.'s neck.

43.     Mr. Chagoyan stood over S.R.J. as she laid on the table.

44.     Mr. Chagoyan positioned himself between S.R.J. and the door, restricting her from being able to leave the room.

45.     The massage concluded shortly thereafter, and Mr. Chagoyan left the room.

46.     Immediately after Mr. Chagoyan left the room, S.R.J. began to search the room for a telephone or some other means of communication so that she could make contact with someone within the Hotel and ask for their assistance.

47.     Unfortunately, S.R.J. was unable to find any telephone or other means of communication with any of the Hotel staff.

48.     S.R.J. was left with no choice but to immediately rush out of the room in order to find someone to help her.

49.     S.R.J. ran to the Hotel gym located across the hall of the Hotel Spa and found another Hotel guest and asked for the guest's assistance.

50.     The Hotel guest escorted S.R.J., ultimately having to carry S.R.J. to the lower level of the Hotel Spa's entrance and reception area and reported the incident to a Hotel representative at the front desk of the Hotel Spa, as S.R.J. was still in shock, shaking and traumatized in the aftermath of the assault.

51.     Despite the fact that S.R.J. was clearly in distress and physically shaken, the Hotel refused to contact the police to come to the Hotel so that a report could be filed, and a formal investigation could take place.

52.     The Hotel further refused to call for an ambulance to provide care to S.R.J. following the assault.

53.     The Hotel also precluded the Hotel medic from accompanying S.R.J. to the Tourist Assistance Center in Los Cabos.

54.     Instead, S.R.J. was forced to leave the confines of the Hotel, as Antonio Argaz, the Security Manager for the Hotel, represented to S.R.J. that the police would not come to the Hotel, and insisted that it was necessary for S.R.J. to leave the Hotel and go to the police to initiate her report.

55.     Hotel staff represented that the police were not allowed to enter the Hotel property.

56.     Mr. Argaz drove S.R.J. thirty (30) minutes to the Tourist Assistance Center in Los Cabos to file a police report.

57.     S.R.J. was forced to depart from the Hotel property and venture into the unfamiliar territory of the country of Mexico, despite the physical manifestations of her distress as she continued to shake and cry in the aftermath of the assault.

58.     Once S.R.J. and Mr. Argaz arrived at the Los Cabos Tourist Assistance Center with her significant other and her parents, S.R.J. had to wait over three (3) hours before she finally had the opportunity to make her report to the police and be examined by a medical professional.

59.     While she was at the Los Cabos Tourist Assistance Center, S.R.J. was informed that the police would have arrived at the Hotel, had they been notified of the assault.

60.     This, of course, is inconsistent with the representations made by Mr. Argaz, who insisted that S.R.J. needed to leave the hotel and travel to the Los Cabos Tourist Assistance Center in order to initiate a report with the police regarding the assault.

61.     S.R.J. was also later informed that the San Jose del Cabo Police Department was closer to the Hotel, and would have been the proper jurisdiction to take S.R.J.'s report.

62.     The Tourist Assistance Center in Los Cabos also indicated to S.R.J. that an incident similar to the assault she endured had taken place at the Hotel in or about 2017.

63.     Upon information and belief, the 2017 incident involved inappropriate sexual conduct toward a guest at the Hotel.

64.     S.R.J. completed a criminal report against Mr. Chagoyan while at the Tourist Assistance Center in Los Cabos.

65.     S.R.J. was also seen by a medical physician while making her report to the police, and had a swab performed for evidentiary purposes.

66.     Immediately after the incident and again upon her return to the Hotel, S.R.J. and her mother requested that the Hotel save all video surveillance footage from the Hotel Spa reception and gym areas of the Hotel.

67.     S.R.J. and her mother further requested that the Hotel preserve the sheets from the spa room where the assault took place.

68.     Representatives from the Hotel informed S.R.J. that the assault was escalated to the Hotel's risk management department, as well as the corporate offices of Marriott International.

69.     At or around this same time, S.R.J.'s mother met with the Hotel manager, Manuel Oviedo.

70.     S.R.J.'s mother impressed upon Mr. Oviedo the importance of preserving all evidence, and demanded that proper measures be taken to ensure preservation of the same.

71.     S.R.J. and her family requested that they be transferred to an alternative hotel property or move S.R.J. to another hotel room for safety purposes.

72.     Despite the request made to the Hotel by S.R.J. and her parents regarding their valid concerns for their safety, their request was ultimately denied.

73.     S.R.J. and her family made repeated requests to management of the Hotel to have the police come to the Hotel.

74.     S.R.J. and her family were assured that the Hotel had called the police and they would come to the Hotel to take a report.

75.     Despite these assurances that the police were called, the police never came to the Hotel.

76.     Instead, it was not until the last day of their vacation that S.R.J. and her family were offered a ride to the police station.

**IV.    The Aftermath of the Assault**

77.     In the days and weeks that followed the assault, S.R.J. continued to experience shock, as well as symptoms of debilitating panic attacks as she tried to participate in her normal daily activities.

78.     On several occasions, S.R.J.'s panic attacks resulted in her having to leave her place of work.

79.     In addition, her positive energy and generally happy demeanor was completely diminished, leaving her feeling as though she was just a shell of who she was before the assault.

80.     S.R.J. was prescribed sleeping pills as she could not sleep, as well as anti-depressants to address her anxiety and depression.

81.     As a direct result of the assault S.R.J. endured, S.R.J. has suffered, and continues to suffer, from severe and permanent mental anguish, anxiety and distress, as well as persistent, negative, trauma-related emotions, including fear, horror, anger, guilt, and shame.

82.     In the aftermath of the assault, S.R.J. also faces overwhelming hypervigilance and relentless sleeplessness.

83.     After the assault, S.R.J. was seen in the emergency department of a hospital.

84.     S.R.J. was also seen and treated by her primary care physician, who recommended that S.R.J. take 1-2 weeks off from her employment.

85.     Ultimately, S.R.J. took a leave of absence from work for a period of ten (10) weeks, from March 2020 through May 2021 so that she could attempt to heal from the pain and suffering she continues to suffer from as a direct result of the sexual assault. S.R.J has been required to take additional days off from her employment since May, 2021 as a direct result of the pain and suffering that she continues to experience due to the sexual assault.

86.     In addition, S.R.J. has maintained and attended regular appointments with her physician, psychologist, a sexual assault psychologist, as well as a psychiatrist, to assist with treating the mentally debilitating effects from the sexual assault.

87.     S.R.J. has, as a direct result of this incident, been diagnosed with severe Post Traumatic Stress Disorder ("PTSD") and dissociation.

88.     S.R.J. has been treated, and continues to be treated, using, among other things, cognitive behavioral techniques to manage panic attacks and unhelpful thoughts and psychoeducation regarding trauma.

89.     In addition, S.R.J.'s treating psychologists have acknowledged that S.R.J.'s symptoms following the sexual assault are demonstrative of panic disorder, anxiety disorder, and depressive disorder.

90.     S.R.J. has also suffered, and continues to suffer, physical symptoms of her distress of chest tightness, chest heaviness, difficulty breathing, lightning bolt sensations, and light headedness.

91.     Not only has S.R.J. suffered these physical symptoms, but she also continues to notice other changes in her everyday life, including disengagement with friends, passive suicide ideation, and a diminished interest in her work.

92.     S.R.J. further suffers from avoidance of triggering environments, including intimacy with her significant other and avoidance of activities like massages and beauty treatments.

93.     S.R.J. continues to struggle with her daily job duties and responsibilities following the aftermath of the assault.

94.     S.R.J.'s emotional and psychological state has continued to deteriorate to such an extent that she was forced to seek new employment as a direct result of her inability to perform at the high level that she once did prior to the sexual assault.

95.     S.R.J.'s overall quality of life has been significantly diminished as a direct result of the trauma of the assault.

96.     As a direct result of the actions, omissions, and/or inactions of Defendants, S.R.J. has suffered and will in the future suffer mental and emotional anguish, embarrassment, fear, humiliation, frustration, loss of well-being, and other intangible injuries.

97.     As a direct result of the actions, omissions, and/or inactions of Defendants, S.R.J. has been prevented from and, in the future, will be prevented from performing her normal activities and is and will be unable to pursue normal and ordinary pleasures of life.

**COUNT I**
**<u>NEGLIGENCE AGAINST ALL DEFENDANTS</u>**

98.     Plaintiff incorporates by reference all allegations set forth in all previous paragraphs, as if fully set forth herein.

99.     At all times material hereto, Defendants marketed themselves to the general public as businesses dedicated to the provision of premium vacation experiences, accommodations, and guest services.

100.     At all material times hereto, the employees of the Hotel Spa were under the direct or indirect supervision, custody, and control of Defendants.

101.     Defendants' core business model revolves, *entirely*, around the successful solicitation of invitees, like Plaintiff, to pay money to Defendants for use and enjoyment of their luxury resorts and the facilities contained therein.

102.     Therefore, Defendants owe a duty of care to the invitee-guests, like Plaintiff, who patronize their businesses to ensure their properties are reasonably safe for the purposes for which they are intended to be used by said invitee-guests.

103.     When Defendants hired and continued to employ Mr. Chagoyan, his supervisor, and all other employees associated with the Hotel Spa, they were under a duty to enact reasonable continuing safety measures to—at a minimum—monitor the activities of these employees, vendors and business service providers, and provide reporting mechanisms to ensure these employees, vendors and business service providers would maintain the safe environment that Defendants were under a duty to maintain for their invitees.

104.     When Defendants began, and continued operating the Hotel, including the Hotel Spa, they were under a duty to ensure that the facility and its employees—at a minimum—posed no unreasonable risks to the health and safety of the invitee-guests at their resort.

105.     When Defendants continued to operate the Hotel, including the Spa, without adequate safety measures in place to support the prevention or immediate exposure of sexual assault being perpetuated upon invitee-guests or any other persons on the premises of the Hotel, they breached their duty to provide a reasonably safe environment for invitee-guests and workers alike.

106.     Defendants have failed to have installed at the Hotel Spa an emergency alert system to notify the Hotel of any inappropriate misconduct that places an invitee in danger.

107.     Defendants' multiple breaches of duty yielded a deceptively unsafe environment for its invitee-guests: a superficially safe luxury resort riddled with inadequate sexual violence detection and prevention measures, staffed by employees who were at best indifferent to, and at worst, *active participants* in the assault described herein.

108.     The deceptively unsafe environment created as the result of Defendants' myriad breaches of duty led to Plaintiff placing her trust in Defendants' representations that their luxury resort and amenities were nothing more than a vacation site, and in reliance on these representations, Plaintiff booked her vacation at the Hotel.

109.     While on her vacation at the Hotel, Defendants' failure to provide adequate safety measures to prevent sexual misconduct in the Spa caused Plaintiff to suffer horrific loss and harm on an immediate *and* long-term basis when she subjected to a violent, prolonged sexual assault as the hands of Mr. Chagoyan under the guise of receiving a service

advertised and provided by the Defendants on site, after Defendants failed to, among other things,:

    a. Develop and implement even *basic* sexual assault prevention, detection, and reporting measures for the protection of invitee-guests and employees alike;

    b. Report Mr. Chagoyan's assault on Plaintiff to Police immediately upon learning of the assault;

    c. Contact the police to come to the scene of the incident;

    d. Arrange for the immediate transportation and emergency medical care of Plaintiff upon learning of her sexual assault at the hands of Mr. Chagoyan;

    e. Terminate Mr. Chagoyan's supervisor after learning of his complete disregard for Plaintiff's obvious, severe trauma suffered at the hands of one of his subordinates; and

    f. Provide telephone access or other access to the front desk to communicate any emergency situation to Hotel management/staff or Hotel security.

110.      After enduring Mr. Chagoyan's ghastly, repeated violations, Plaintiff's humiliation and suffering were compounded and perpetuated by Defendants' unsympathetic responses to her suffering.

111.      These egregious breaches of the most basic duties by Defendants have compounded to impose upon Plaintiff—a young woman with an established professional career, academic honors from respected institutions, and a history of decorated athletic performances—a litany of terrible physical and psychological effects, including, but not limited to:

    a. Intense and prolonged severe anxiety and distress;

    b. Post Traumatic Stress Disorder and Dissociation;

    c.   Persistent negative trauma related emotions, such as fear, horror, anger, guilt, shame, hypervigilance, and sleeplessness;

    d.   Prolonged negative impact on S.R.J.'s relationship with her long-term significant other.

112.      As a result of her suffering these physical and psychological harms, other areas of Plaintiff's life have been dramatically impacted in negative ways, including:

    a.   Plaintiff's needing to take multiple doctor-prescribed *weeks* of time off work to attempt to recover from the mental and physical effects of Mr. Chagoyan's violent sexual assault;

    b.   Plaintiff's needing to maintain a standing appointment with multiple psychologists and sporadic appointments with a psychiatrist for evaluation;

    c.   Plaintiff's needing to be prescribed anti-depressant medication, anti-anxiety medication, and sleeping pills to deal with the resulting trauma of Mr. Chagoyan's sexual assault.

WHEREFORE, Plaintiff, S.R.J., demands judgment in her favor and against Defendant, in an amount in excess of $75,000, plus pre-judgment interests, post-judgment interest, costs, attorneys' fees, and other such relief as the court deems just and appropriate.

### COUNT II
### NEGLIGENCE-RESPONDEAT SUPERIOR AGAINST ALL DEFENDANTS

113.      Plaintiff incorporates by reference all allegations set forth in all previous paragraphs, as if fully set forth herein.

114.      Defendants employed Mr. Chagoyan at all times relevant to the events discussed herein.

115.        Upon information and belief, Defendants employed Mr. Chagoyan to solicit invitee-guests to purchase massage and spa services, which Defendants authorized Mr. Chagoyan with performing himself.

116.        Pursuant to the employment relationship between Defendants and Mr. Chagoyan, Mr. Chagoyan performed these duties of his employment within the operating hours of the Hotel Spa, on the Hotel's premises, directed at the Hotel invitees, as set forth by Defendants, and in the facilities dictated by Defendants.

117.        Pursuant to the employment relationship or contractual obligations between Defendants and Mr. Chagoyan and/or Mr. Chagoyan's employer, Mr. Chagoyan solicited Plaintiff and her mother as potential customers for Defendants' Spa, and Mr. Chagoyan commenced the services in question as part of the services Mr. Chagoyan and his employer were to contractually obligated to provide, after Plaintiff and her mother agreed to purchase said services.

118.        At all material times hereto, Mr. Chagoyan was acting purposefully to serve Defendants to their benefit.

119.        The "services" Mr. Chagoyan purported to perform when he sexually assaulted Plaintiff were superficially similar to the duties of his employment role as a Mr. Chagoyan, i.e., Mr. Chagoyan was to use his hands in a professional manner to manipulate Plaintiff's body so as to perform a massage.

120.        Therefore, it was expected by Defendants that Mr. Chagoyan would intentionally make physical contact with invitee-guests as part of the services he was obligated to provide.

121.     Mr. Chagoyan took advantage of the physical proximity offered by the role Defendants granted him the opportunity to prey upon unsuspecting customers like Plaintiff.

122.     As a result of Mr. Chagoyan's misuse of the powers and duties bestowed upon him by Defendants by virtue of the employer-employee relationship between the two, Plaintiff was subjected to vicious assault by Mr. Chagoyan.

123.     As Mr. Chagoyan's assault on Plaintiff occurred during the course and scope of his employment as a masseuse and a representative of the Hotel Spa, Defendants are responsible for the damages incurred by Plaintiff as the result of Mr. Chagoyan's misconduct.

WHEREFORE, Plaintiff, S.R.J., demands judgment in her favor and against Defendant, in an amount in excess of $75,000, plus pre-judgment interests, post-judgment interest, costs, attorneys' fees, and other such relief as the court deems just and appropriate.

## COUNT III
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## AGAINST ALL DEFENDANTS

124.     Plaintiff incorporates by reference all allegations set forth in all previous paragraphs, as if fully set forth herein.

125.     Defendants' conduct resulting the in the sexual assault of Plaintiff was so extreme and outrageous as rise to the level of malice, because:

   a.  Defendants retained Mr. Chagoyan's services after he assaulted an invitee-guest *on site*;

   b.  Defendants developed and implemented procedures designed to cover up Mr. Chagoyan's assault, and other incidents like it, at the expense of providing proper assistance for victims of such crimes;

126.     As a result of this egregious conduct, Plaintiff was lured and entrapped into a confined area owned by Defendants, where Mr. Chagoyan sexually assaulted her.

127.     Plaintiff was then subjected to the humiliation and suffering imposed by procedures specifically designed by Defendants to prevent parties like Plaintiff from obtaining medical attention and seeking justice in response to Mr. Chagoyan's crimes.

128.     Such behavior—by an international conglomerate of luxury resorts, no less—shocks the conscience, and as a result of this behavior, Plaintiff has suffered, and continues to suffer, the myriad, ongoing physical and psychological traumas laid out previously herein.

WHEREFORE, Plaintiff S.R.J. demands judgment in her favor and against Defendant in an amount in excess of $75,000, plus pre-judgment interests, post-judgment interest, costs, attorneys' fees, and other such relief as the court deems just and appropriate.

## COUNT IV
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## AGAINST ALL DEFENDANTS

129.     Plaintiff incorporates by reference all allegations set forth in all previous paragraphs, as if fully set forth herein.

130.     Defendants, individually and through their agents, employees and/or representatives, had a duty to exercise reasonable and ordinary care in the operation of the Hotel and Spa, and further in the hiring and supervision of all employees, agents, and other representatives, all to the benefit of Hotel and Spa guests, patrons, business invitees, and persons like Plaintiff.

131.     Defendants were on notice that criminal activity of a sexual nature could, and did occur, in the Hotel Spa.

132.     Defendants knew, or reasonably should have known, that they had an obligation to safeguard against, and protect their business invitees from criminal activity of a sexual nature in the Hotel Spa they owned and operated and, without such safeguards and appropriate polices and procedures in place, the Hotel Spa could allow for opportunities of such criminal activity to take place.

133.     Defendants knew, or through the exercise of ordinary and reasonable care, should have known that victims of sexual assault are highly likely to suffer all of the symptoms and ongoing traumas Plaintiff continues to suffer today.

134.     Defendants had a duty to take reasonable precautions to protect their guests, patrons, and business invitees from criminal activity, such as sexual assault.

135.     Defendants had a duty to supervise and exercise reasonable care to control their employees, agents, and other representatives from conducting themselves in a way that could create an unreasonable risk of emotional harm to guests, patrons, and business invitees of the Hotel and Spa.

136.     Finally, because Defendants knew that a prior incident had occurred at the Hotel Spa in or about 2017, Defendants had actual or constructive knowledge that their Spa employees, agents, and representatives posed a potential threat of sexual assault to guests, patrons, and business invitees.

WHEREFORE, Plaintiff S.R.J. demands judgment in her favor and against Defendant in an amount in excess of $75,000, plus pre-judgment interests, post-judgment interest, costs, attorneys' fees, and other such relief as the court deems just and appropriate.

## COUNT V
## <u>FALSE IMPRISONMENT AGAINST ALL DEFENDANTS</u>

137.    Plaintiff incorporates by reference all allegations set forth in all previous paragraphs, as if fully set forth herein.

138.    Defendants, through its employee Mr. Chagoyan, generally controlled entry and egress from the Spa at Defendants' Hotel.

139.    Moreover, Defendants' Spa is comprised of several separate and private rooms and areas devoted to different purposes.

140.    The massage rooms are some of the more private areas of the Spa, often times being occupied by only Mr. Chagoyan and the invitee-guest of the Hotel Spa when services are being performed.

141.    When performing the employment duties (personal spa and massage services) that facilitated his sexually assaulting Plaintiff, Mr. Chagoyan was at all relevant times, the only employee, representative, or agent of Defendants in the room with Plaintiff.

142.    Mr. Chagoyan is significantly larger than Plaintiff, and readily capable of physically dominating her.

143.    During the sexual assault, and despite Mr. Chagoyan's overwhelming size, Plaintiff attempted different maneuvers at different times throughout the assault to end Mr. Chagoyan's improper conduct, but to no avail.

144.    Rather, Mr. Chagoyan repeatedly and forcefully restrained Plaintiff's body from retreating from the room while he continued his sexual assault of Plaintiff.

145.    Even after Plaintiff was able to temporarily halt Mr. Chagoyan's sexual assault by rising from the table and shoving Mr. Chagoyan away, Mr. Chagoyan bore down on

Plaintiff, continuing to massage her neck and arms while placing S.R.J. in extreme fear for her life.

146.     These acts by Mr. Chagoyan, while under the employ of Defendants, resulted in direct interference with Plaintiff's liberty.

147.     As a result of Mr. Chagoyan's false imprisonment of Plaintiff while working for Defendants, Plaintiff endured a sexual assault and the myriad associated harms that follow such a traumatic experience, as she was restricted from leaving the Spa room and was placed in fear for her life as a direct result of Mr. Chagoyan's actions.

WHEREFORE, Plaintiff S.R.J. demands judgment in its favor and against Defendant, Defendant I, in an amount in excess of $75,000, plus pre-judgment interests, post-judgment interest, costs, attorneys' fees, and other such relief as the court deems just and appropriate.

Respectfully submitted,

THE LYNCH LAW GROUP, LLC

By: /s/ Frank C.Botta____
    Frank C. Botta, Esquire
    PA I.D. No. 52004
    The Lynch Law Group
    375 Southpointe Boulevard
    Canonsburg, PA 15317
    724-776-8000
    724-776-8001 (fax)
    ***Counsel for Plaintiff, S.R.J.***